**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| IN RE ASPEN TECHNOLOGY, INC., | ) | C.A. No. 2025-0210-SEM (MTZ) |
| SECTION 220 LITIGATION | ) | |

## <u>ORDER REGARDING EXCEPTIONS</u>

**WHEREAS**:[1]

A.    Plaintiff Kevin Barnes served a demand under 8 *Del. C.* § 220 on defendant Aspen Technology, Inc. ("Aspen" or the "Defendant") on February 13, 2025.[2]    Plaintiff Elliott Associates, L.P. ("Elliott," and together with Barnes, "Plaintiffs") served its demand on February 19.[3]   Their demands identified several purposes for inspection, but they all largely relate to the purpose of investigating potential wrongdoing in a conflicted controller transaction: nonparty Emerson Electric Co.'s ("Emerson") acquisition of the minority of Aspen it did not already own through a tender offer and merger.[4]

---

[1] References to the admitted and undisputed facts in the Pretrial Stipulation and Order ("PTO," Docket item ("D.I.") 33) are cited as "PTO ¶ __." Joint trial exhibits are cited as "JX __." The Magistrate's final post-trial report (D.I. 56) is cited as "Rpt. __." Citations in the form of "POB __" refer to Plaintiffs' opening brief, available at D.I. 62. Citations in the form of "DAB __" refer to Aspen's answering brief, available at D.I. 65. Citations in the form of "PRB __" refer to Plaintiffs' reply brief, available at D.I. 66.

[2] JX 203.

[3] JX 204.

[4] JX 203; JX 204.

B.    Aspen produced formal board materials concerning the acquisition.[5]

Between Aspen's production and public disclosures, Plaintiffs have put together a

detailed timeline.  Relevant details in Plaintiffs' narrative include:

1) Aspen formed a "Director Group" to consider alternatives to an Emerson takeover before Emerson's standstill expired.[6]

2) Aspen's board chair, Jill Smith, departed at the beginning of negotiations, with Aspen disclosing she resigned[7] and Emerson disclosing she was ushered out due to disagreements with Emerson;[8] Emerson elevated director Whelan to chair; and Whelan's elevation left a board seat vacant.[9]

3) The Director Group retained Perella Weinberg Partners LP ("PWP") as an advisor;[10] PWP was entitled to a fee upon an Emerson take-private even if it was dismissed;[11] yet PWP was dismissed and replaced, in keeping with Whelan's recommendation to do so.[12]

4) Aspen's board had a standing Related Party Transaction Committee,[13] but created a separate Special Committee for the Emerson transaction comprised of Whelan, an Emerson-appointed director, and a third director.[14]  The Special Committee engaged advisors other than PWP[15] that Plaintiffs contend are conflicted.  The two committees were activated at different times throughout the negotiations.

---

[5] PTO ¶ 122.

[6] *Id.* ¶ 11; JX 8–12.

[7] JX 202 at 12.

[8] *Id.* at 15.

[9] PTO ¶ 25.

[10] *Id.* ¶ 12; JX 14.

[11] PTO ¶ 56; JX 134.

[12] PTO ¶¶ 30, 61; JX 133, 134.

[13] JX 56 at 2.

[14] JX 200 at 23.

[15] PTO ¶ 51; JX 200.

2

5) Emerson misrepresented the size of the premium its offer represented, and the Special Committee knew it.

C. To investigate those details, Plaintiffs sought an additional mix of formal board materials, informal board materials, and officer materials. Aspen refused to produce them. Plaintiffs came to this Court, and their additional requests were tried before a Magistrate in Chancery on June 11, 2025.[16] The only dispute was whether the additional requests are "necessary and essential."[17]

D. On June 17, the Magistrate issued a prompt and detailed oral final report declining Plaintiffs' request for further documents (the "Final Report").[18] The Magistrate did so under Delaware common law governing Barnes' demand, rather than the recently enacted statutory standards governing Elliott's demand, which are subject to a constitutional challenge that is stayed pending resolution of a similar challenge by the Delaware Supreme Court.[19]

E. On June 23, 2025, Plaintiffs filed a Notice of Exceptions to the Final Report (the "Exceptions").[20] The matter was assigned to the undersigned on July 1, 2025, solely for the purpose of hearing the exceptions.[21]

---

[16] D.I. 47.

[17] Rpt. 19.

[18] D.I. 53; Rpt.

[19] Rpt. 21–22; D.I. 46.

[20] D.I. 55.

3

F.     The parties briefed the Exceptions.[22]   I took the Exceptions under advisement on September 5, 2025.[23]

**AND NOW**, on this 6th day of October, 2025, the Court finds and orders as follows:

1.     A hearing on the Exceptions is unnecessary.   The Court has considered *de novo* the issues on exception.[24]

2.     I begin with whether Barnes has shown the documents he seeks are necessary and essential under the standards governing his demand.   "The plaintiff bears the burden of proving that each category of books and records is essential to accomplish[] the stockholder's articulated purpose for the inspection."[25]   The necessary and essential standard is a demanding one:   the Court must "narrowly tailor the inspection right to a stockholder's stated purpose."[26]   Documents are necessary and essential if they "address the 'crux of the shareholder's purpose' and

---

[21] D.I. 59.

[22] D.I. 62; D.I. 65; D.I. 66.

[23] D.I. 67.

[24] *See DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del. 1999).

[25] *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996).

[26] *Id.*; *accord Cook v. Hewlett-Packard Co.*, 2014 WL 311111, at *3 (Del. Ch. Jan. 30, 2014) (noting that in its vigilance to prevent Section 220 from being used as a tool of oppression, the court will limit relief to those records that are necessary and essential).

4

if that information 'is unavailable from another source.'"[27]  "[T]he court must give the petitioner everything that is 'essential,' but stop at what is 'sufficient.'"[28]  "In determining the scope of inspection, the Court may consider the information previously furnished by the corporation . . . ."[29]

3.      "The starting point (and often the ending point) for an adequate inspection will be board-level documents that formally evidence the directors' deliberations and decisions and comprise the materials that the directors formally received and considered, the 'Formal Board Materials.'"[30]  Where the documents sought are communications, rather than formal board materials, the stockholder must show a specific need for those communications to satisfy the "necessary and essential" standard.  "[T]he Court of Chancery should not order emails to be produced when other materials (*e.g.*, traditional board-level materials, such as minutes) would accomplish the petitioner's proper purpose, but if non-email books

[27] *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1271 (Del. 2014) (quoting *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 371–72 (Del. 2011).

[28] *KT4 P'rs LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 752 (Del. 2019).

[29] *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 685 A.2d 702,714 (Del. Ch. 1995).

[30] *Lebanon Cty. Emps.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at *24 (Del. Ch. Jan. 13, 2020), *aff'd*, 243 A.3d 417 (Del. 2020); *Woods Tr. of Avery L. Woods Tr. v. Sahara Enters., Inc.*, 238 A.3d 879, 897 (Del. Ch. 2020); *accord Cook v. Hewlett-Packard Co.*, 2014 WL 311111, at *4 (Del. Ch. Jan. 30, 2014) (concluding a production of every nonprivileged page of board-level documents was sufficient for the plaintiff to investigate wrongdoing by officers and directors).

and records are insufficient, then the court should order emails to be produced."[31]

If a plaintiff makes that showing, then the Court can expand the universe of books and records to include "informal materials that evidence the directors' deliberations, the information that they received, and the decisions they reached . . . ."[32]

4.       On exception, Barnes seeks seven categories of documents.  I take each in turn.

   **a. Director Group records:   formal board materials, including presentations from PWP and other advisors, before Emerson's standstill expired.**

   i.       Barnes seeks additional banker presentations delivered at Director Group meetings between the fall of 2023 and at least through April of 2024.  The Director Group met many times during this time frame to discuss Aspen's options once Emerson's standstill expired.[33]  It was known Emerson wanted to own 100% of Aspen.[34]  Aspen produced board minutes from ten Director Group meetings, five sets of which expressly refer to banker presentations or analyses from PWP

---

[31] *Palantir*, 203 A.3d at 752–53 (citations omitted); *In re UnitedHealth Grp., Inc. Section 220 Litig.*, 2018 WL 1110849, at *9 (Del. Ch. Feb. 28, 2018) ("Unlike the production of other books and records, email communications are generally 'the exception rather than the rule.'").

[32] *AmerisourceBergen Corp.*, 2020 WL 132752, at *25 (Del. Ch. Jan. 13, 2020), *aff'd*, 243 A.3d 417 (Del. 2020); *accord Ok. Firefighters Pension & Ret. Sys. v. Amazon.com, Inc.*, 2022 WL 1760618, at *12 (Del. Ch. June 1, 2022).

[33] JX 200 at 21.

[34] JX 253 at 16; JX 242 at 8; Rpt. 8.

and the Special Committees' eventual bankers.[35]  Aspen produced only one of those presentations.[36]

ii.     These formal board materials are necessary and essential to Barnes' investigatory purpose.[37]  They set the stage with what advisors told Aspen's fiduciaries about its options with Emerson and Aspen's valuation before starting negotiations.  They offer Aspen's baseline.  What's more, those advisors would be retained by the Special Committee, and some of those fiduciaries would end up on the Special Committee.  And they speak to the Director Group's selection of PWP as its advisor, which would reverberate through Smith's resignation and PWP's replacement despite still being owed a fee.

**b. Smith's resignation records:  formal and informal board materials, and officer-level materials, to clear up the conflicting narratives as to why she resigned.**

i.     Smith led the Director Group's consideration of Aspen's options once the standstill expired, and signed PWP's engagement letter.[38]  She resigned from

---

[35] JX 8; JX 9; JX 10; JX 11; JX 12.

[36] JX 16.

[37] That the requested banker presentations were delivered "before any negotiations on the Merger began" is not fatal to Barnes's request.  DAB 27.  *See Lavin v. West Corp.*, 2017 WL 6728702, at *14 (Del. Ch. Dec. 29, 2017) (holding that the "relevant time period implicated" by the plaintiff's credible basis to suspect wrongdoing with respect to a transaction includes "the period beginning when . . . the Board began contemplating strategic transactions").

[38] PTO ¶¶ 11–12.

the board suddenly, five days before the standstill expired.[39]  Aspen's May 2024 disclosures say she resigned "for personal reasons."[40]  Emerson's February 10, 2025 Offer to Purchase ("OTP") disclosed Emerson asked her to leave due to "various differences of opinion" regarding her leadership, including proposing management candidates Emerson did not like, and engaging PWP.[41]  Emerson appointed Whelan to replace Smith as board chair.[42]

     ii.    Barnes would like formal and informal board materials to clear up the reason for Smith's departure, and officer-level materials to investigate Aspen's disclosures about it.  Barnes has not shown he needs those materials to investigate. He contends "the record provides no clarity" on the circumstances surrounding Smith's resignation.[43]  That is not so.  The OTP discloses, and Barnes recites, the various reasons for which Smith was "criticized" by Emerson's leadership.[44] Barnes has sufficient information to achieve his stated purpose of investigating wrongdoing:  he has a foothold for investigating that Emerson wanted Smith out

---

[39] JX 237 at 3; PTO ¶¶ 9, 27; JX 6 at 23.

[40] JX 237 at 3; JX 236 at 1.

[41] JX 202 at 15.

[42] JX 47.

[43] POB 49.

[44] JX 202 at 15; POB 48.

before it started making moves, and that Aspen disclosed a different reason at the time. He is not entitled to more.[45]

### c. PWP records: formal and informal board materials on PWP's suspension; and formal and informal board materials, plus officer materials, on PWP's entitlement to a fee.

i.      Aspen suspended PWP's engagement on the Emerson transaction even though PWP remained entitled to a substantial tail fee. Aspen has only produced PWP's letter to Whelan confirming its suspension,[46] and formal materials documenting the Special Committee's retention of different advisors.[47]

ii.      Barnes seeks formal and informal board materials on PWP's suspension, in furtherance of his purpose of investigating wrongdoing. Other evidence indicates PWP was inclined to be aggressive towards Emerson;[48] Smith's

---

[45] *Frank v. Nat'l Hldgs. Corp.*, C.A. No. 2021-0160-MTZ, at 15–16 (Del. Ch. July 22, 2022) (TRANSCRIPT) ("Frank's position is that so long as he has questions that are left unanswered, or rocks he has not overturned, he is entitled to more. That is not our law, particularly in the context of board and management communications."). Plaintiff's citation to *Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc.* does not disturb this conclusion. 2005 WL 1713067, at *9 (Del. Ch. July 13, 2005). In determining whether the plaintiff had a proper purpose, the *Deephaven* Court viewed two conflicting press releases, together with other evidence, as credible evidence supporting an inference of wrongdoing. *Id. Deephaven* does not stand for the proposition that conflicting public disclosure always make underlying informal materials necessary and essential to investigating wrongdoing.

[46] JX 67.

[47] JX 200 at 22.

[48] JX 16 at 5, 59.

9

departure was based in part on her engagement of PWP;[49] and Whelan is the one who recommended PWP's suspension, "apparently through informal channels."[50] Barnes contends these facts "raise[] questions about Emerson's interference with the selection of sell-side financial advisors."[51]

       iii.    Barnes is entitled to formal and informal board materials on PWP's suspension. He does not have materials sufficient to investigate any wrongdoing by Emerson in Aspen's suspension of PWP. The timing, the fact that the suspension recommendation came from Whelan, the indicia that Emerson disfavored the PWP engagement enough to remove Smith over it, and signs that PWP would be aggressive towards Emerson, all amount to smoke. Barnes is entitled to documents necessary and essential to investigate if there is fire. Barnes has argued, and Aspen did not dispute, that Whelan's recommendation was made informally. The nature of that communication means Barnes is unlikely to uncover any meaningful answers in the formal materials already produced.[52] Barnes has carried his burden to show the formal board materials he already has are

---

[49] JX 202 at 15.

[50] POB 51.

[51] *Id.* at 52.

[52] *See Palantir*, 203 A.3d at 756 ("[W]hen a petitioner . . . reasonably identifies the documents it needs and provides a basis for the court to infer that those documents likely exist in the form of electronic mail, the respondent corporation cannot insist on a production order that excludes emails even if they are in fact the only responsive corporate documents that exist and are therefore by definition necessary.").

10

insufficient for purposes of investigating any wrongdoing by Emerson in Aspen's suspension of PWP.

iv.     Barnes also seeks formal and informal board materials, and officer-level materials, regarding PWP's entitlement to a fee. Aspen produced the Special Committee's November 10 meeting minutes addressing its awareness of PWP's fee and its decision to proceed with engaging other advisors.[53] Barnes' briefing on exception probes whether Aspen paid PWP its tail fee or what the size was; Barnes estimated the fee owed was over $40 million.[54] Indeed, depending on the facts, the size of an advisor fee can support a concern about corporate wrongdoing.[55]

v.     On September 23, Plaintiffs filed a letter informing the Court of a recent development that clarifies much of what Barnes wants to know about the fee.[56] On September 4, PWP filed an action for breach of contract in the New York State Supreme Court for the County of New York, seeking payment of the tail fee.[57] PWP's complaint asserts it is owed no less than $67 million.[58] The complaint reinforces what Barnes already knew from public disclosures and the materials Aspen already produced: that PWP was owed a substantial tail fee

---

[53] JX 134 at 3–4.

[54] POB 53.

[55] *E.g.*, *Woods*, 238 A.3d at 902.

[56] D.I. 70.

[57] D.I. 70 Ex. A.

[58] JX 134 at 3–4.

upwards of $40 million.[59]  And it contains the remaining answer Barnes seeks: that PWP was not paid.[60]  Barnes has not otherwise shown he needs more in connection with PWP's fee.[61]  Plaintiffs' letter does not explain what else is missing, between public disclosures, PWP's complaint, and the formal materials already produced.

### d. Special Committee records:  informal board materials regarding the Special Committee's composition and selection of advisors, and officer materials regarding selection of advisors.

i.     Barnes seeks informal board materials on the selection of the Special Committee members, in view of the facts that two Emerson-affiliated directors were selected even though an independent director was not chosen, a board seat sat vacant, and there was already a standing Related Party Transaction Committee. Aspen's disclosures state the Board identified the Special Committee members "based on preliminary discussions of each Board member's independence and disinterest with respect to Emerson and a potential strategic proposal by

---

[59] D.I. 70 Ex. A.

[60] *Id.*

[61] *See Greenlight Cap. Offshore P'rs, Ltd. v. Brighthouse Fin., Inc.*, 2023 WL 8009057, at *6 (Del. Ch. Nov. 20, 2023) ("If adequate public information exists to satisfy the stockholder's stated purpose, the Section 220 demand will be denied."); *see also Espinoza*, 32 A.3d at 371–72 ("A document is 'essential' for Section 220 purposes if . . . the essential information the document contains is unavailable from another sources."); *Sanders v. Ohmite Hldgs., LLC*, 17 A.3d 1186, 1195 (Del. Ch. 2011) ("[I]f the stockholder already has 'sufficient' information from other sources . . . then the inspection similarly can be curtailed.").

Emerson."[62]  Aspen produced minutes recording the Special Committee members' appointment; independence questionnaires for each director;[63] formal minutes reflecting discussion of the process of forming a special committee;[64] and resolutions appointing the three members.[65]

ii.   Barnes does not need informal board materials on the Special Committee members' selection to investigate the Special Committee members' independence from Emerson.   The formal board materials contain sufficient information on the Special Committee members' ties to Emerson, the fact that Emerson-affiliated directors were on the Special Committee when other options were available, and how negotiations proceeded.  Put differently, the selection of the Special Committee members is not the "crux of the shareholder's purpose."[66] Barnes' request for those materials is denied.

iii.   Barnes also wants informal board materials and officer-level materials reflecting the Special Committee's selection of its financial advisors, including one with a substantial relationship with Emerson.   The formal materials are sufficient: they reflect the Special Committee's assessment and determination that the

---

[62] JX 200 at 23.

[63] JX 85–86; JX 94; JX 96–103.

[64] JX 129 at 2.

[65] *Id.* Ex. A.

[66] *Espinoza*, 32 A.3d at 371–72.

advisors were independent,[67] and the Special Committee's consideration of PWP's fee.[68] I have also ordered Aspen to produce those advisors' pitch presentations to the Director Group, and formal and informal board materials on PWP's suspension. Barnes has not shown he needs more.

e. **Projection adjustment records: informal board materials and officer materials to assess the decision to alter projections to drop the acquisition, and Emerson's role in it.**

i. Barnes seeks informal and officer-level materials regarding Aspen's projections and their treatment of an acquisition Aspen favored but Emerson disfavored. But Barnes knows the acquisition was excluded from the projections and at whose direction, and has a credible basis as to why.[69] That is sufficient to investigate wrongdoing. Barnes has not shown he needs more.[70]

---

[67] JX 130; JX 132; JX 134.

[68] JX 134.

[69] PRB 35; JX 200 at 26 ("Because [Emerson's CEO] believed that given Emerson's submission of the November 5 Proposal, the pursuit of [the potential acquisition] would be a distraction, [the CEO] called Mr. Whelan to inform him that Emerson would not support [the potential acquisition] at this time."); JX 178.

[70] This case is distinguishable from *Hightower v. SharpSpring, Inc.*, on which Plaintiffs rely. 2022 WL 3970155, at *7 (Del. Ch. Aug. 31, 2022). There, the Court ordered production of informal and officer-level materials addressing "the events surrounding [] updated projections." *Id.* at *10. That conclusion was based on a showing of inconsistencies between the proxy and the formal materials as to why the company updated its projections and at whose direction. *Id.* at *4. Barnes has not pointed to similar gaps warranting further intrusion.

**f. Premium misrepresentation records:  informal board materials reflecting the Special Committee's consideration of whether to correct the misrepresentation.**

i.      Barnes seeks informal board materials regarding the Special Committee's consideration of Emerson's public statements about the premium it offered over the unaffected stock price.  Formal materials show the Special Committee knew Emerson's figure was inaccurate.[71]  Barnes wants to know "whether the Special Committee considered correcting the record," in pursuit of investigating whether stockholders were informed and the Special Committee's independence.[72]  But the Special Committee told stockholders its own view of Emerson's premium.[73]  The Special Committee's informal treatment of Emerson's calculation is not necessary and essential to Barnes' investigation of wrongdoing.

**g. Negotiation timing records:  informal board materials on whether the Special Committee authorized Whelan to agree to lock up a deal before Aspen's next earnings release.**

i.      The Special Committee's January 6, 2025 minutes narrate the conversation in which Whelan agreed to Emerson's request to lock in a deal before

---

[71] JX 173 at 5 (noting "[t]he premise of [Emerson's] stated premium is, therefore, not accurate").

[72] POB 62.

[73] JX 200 at 24 (disclosing that "[t]he November 5 Proposal represented a 1% premium to [Aspen's] Share price of $237.59 on November 4, 2024, the date immediately prior to the November 5 Proposal").

Aspen announced positive quarterly earnings in February 2025.[74] The minutes also describe the Special Committee's subsequent direction to Whelan: to raise the price by $35 per share.[75] The formal board materials do not state that the Special Committee authorized Whelan's concession. Barnes wants informal board materials on that point, and whether the Special Committee considered the positive effect the earnings release would have on Aspen's stock price.

ii. Whether Whelan was authorized is far from the "crux" of Barnes' investigatory purpose. Barnes knows Whelan gave up leverage, and knows how the Special Committee responded. The Special Committee's reaction is in the formal board minutes.[76] Barnes is not entitled to informal board materials on this point.

### h. Documents for Elliott

i. Barnes has fallen short of the common law standard for many of his requests. Like the Magistrate, I believe that a stockholder who falls short of this standard would also fall short under 8 *Del. C.* §§ 220(f)–(g). It follows Elliott would not be entitled to those materials, either.

---

[74] JX 171 at 1–2.

[75] *Id.* at 2 ("Following discussion, the Special Committee determined that Mr. Whelan should respond to the January 6 Emerson offer with a counteroffer of $286 per Share").

[76] *See, e.g.*, *id.*; JX 175; JX 176 ("Mr. Whelan then explained . . . that, while the Special Committee believed that time was of the essence, the Special Committee was comfortable recommending that [Aspen] continue as a standalone company if Emerson was not able to increase its offer price.")

ii. That leaves the question of what to do about the documents I have awarded Barnes. Elliott has argued the application of Section 220 as recently amended to its demand is unconstitutional, and that argument is stayed pending the Delaware Supreme Court's adjudication of a similar issue.[77] On exception, Elliott seeks production of the documents Barnes will receive under a confidentiality order permitting sharing books and records with similarly situated stockholders.[78] Aspen objects, vaguely gesturing in the direction of Section 220 as amended and asserting two separate confidentiality orders would be required.

iii. On these unique facts, fairness warrants permitting Elliott to receive the same materials sought by Barnes, under a single confidentiality order. Plaintiffs' demands sought to inspect books and records pertaining to the same transaction for the same proper purpose. The demands were separated by only six days, and Section 220 was not retroactive when Elliott served its demand. This Court has broad discretion to "place reasonable confidentiality restrictions on a Section 220 production."[79] "The restrictions cannot, however, impart 'inequitable notion[s]

---

[77] POB 66.

[78] *Id.* at 5, 66; *see, e.g.*, *Jefferson v. Dominion Hldgs., Inc.*, 2014 WL 4782961, at *2 (Del. Ch. Sept. 24, 2014); *Nottingham P'rs v. Trans-Lux Corp.*, 1987 WL 7534, at *2 (Del. Ch. Feb. 4, 1987).

[79] *Tiger v. Boast Apparel, Inc.*, 214 A.3d 933, 937 (Del. 2019); *see also CM & M Grp., Inc. v. Carroll*, 453 A.2d 788, 793–94 (Del. 1982); *Disney v. Walt Disney Co.*, 857 A.2d 444, 447 (Del. Ch. 2004).

into Delaware's Section 220 jurisprudence.'"[80]   Aspen has not identified any concrete prejudice it would suffer from a single confidentiality order.


*/s/ Morgan T. Zurn*

Vice Chancellor Morgan T. Zurn

---

[80] *Greenlight*, 2023 WL 8009057, at *10 (citing *Ravenswood Inv. Co., L.P. v. Winmill & Co. Inc.*, 2014 WL 2445776, at *4 (Del. Ch. May 30, 2014)).